IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR THE SEARCH OF PROPERTY AS MORE PARTICULARLY DESCRIBED IN ATTACHMENT A TO THE AFFIDAVIT OF SPECIAL AGENT TALLIO DATED SEPTEMBER 15, 2025 | Case No.  2:25-cr-01101 <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Kyle Tallio, a Special Agent with the Department of Homeland Security Investigations ("HSI"), being first duly sworn, depose and state under oath as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I have been employed as a Special Agent ("SA") of the HSI since 2018 and am currently assigned to the HSI office in Charleston, South Carolina. While employed by HSI, I have experience investigating violations of federal criminal law involving the use of the internet, including related child exploitation and child pornography. I have gained experience through training and work relating to conducting these types of investigations, including through participation in numerous search warrants focused on child exploitation and child pornography offenses. I have received training in the area of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256(8)(A), and also referred to in this Affidavit as "child sexual abuse material" or "CSAM") in all forms of media including computer media. Moreover, I am a federal law

enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251, 2252, 2252A, 2422, and 2423, and I am authorized by law to request a search warrant.

2.  In the course of my employment as a sworn law enforcement officer, I have participated in the execution of numerous search warrants resulting in the seizure of computers, storage media for computers, other electronic media, and other items evidencing violations of state and federal laws, including those involving child exploitation offenses.

3.  This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the locations specifically described in **Attachment A** of this Affidavit, including the entire property located at ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (the "PREMISES"), the electronic storage devices located therein, and any person located at the PREMISES, for contraband and evidence, fruits, and instrumentalities of violations of Title 18, United States Code, § 2252A, which items are more specifically described in **Attachment B** of this Affidavit.

4.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of Title 18 United States Code, § 2252A (Certain activities relating to material constituting or containing child pornography) are presently on the property more particularly described in Attachment A.

2

**STATUTORY AUTHORITY**

5. As noted above, this investigation concerns alleged violations of the following:

   a. 18 U.S.C. Section 2252A criminalizes activities relating to the sexual exploitation of children and material involving the sexual exploitation of minors by any person who knowingly possesses, knowingly accesses with intent to view, receives, transports or ships such material in interstate commerce by any means, to include computers. This material involves the visual depiction of minors engaging in sexually explicit conduct.

**DEFINITIONS**

6. The following definitions apply to this Affidavit and Attachment B:

   a. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

   b. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

   c. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual

3

depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

e. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software,

4

documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g. A "hash value" is a unique multi-character number that is associated with a computer file. Some computer scientists compare a hash value to an electronic fingerprint in that each file has a unique hash value. Any identical copy of the file will have exactly the same hash value as the original, but any alteration of the file, including even a change of one or two pixels, would result in a different hash value. Hash values represent large amounts of data as much smaller numeric values, so they are used with digital signatures.

h. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

j. "Mobile application" or "chat application," as used herein, are small, specialized programs downloaded onto mobile devices, computers and other digital devices that enable users to perform a variety of functions, including engaging in online chat and sending or receiving images and videos.

k. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

l. "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

m. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

n. A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

o. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## PROBABLE CAUSE

***National Center for Missing and Exploited Children CyberTipline Report***  ███████

7.  On December 4, 2024, PayPal, Inc, a financial technology company that facilitates peer to peer online money transfers, filed a National Center for Missing and Exploited Children (NCMEC) CyberTipline Report ███████ ("the NCMEC CyberTip"), identifying concerns relating to transactions to a collection of fifty one (51) United Kingdom based accounts which PayPal suspected may be associated to one person, ████████████████████. PayPal was able to link the ███████ accounts based on common identifiers, including common name, street address, phone number, device used to access PayPal, and computer cookies. PayPal identified 171 accounts which sent or attempted to send money to the ███████ accounts ("suspected buyer PayPal accounts"). Through a subsequent review of data obtained from PayPal, Inc., transactions have been identified between the ███████ accounts and the suspected buyer PayPal accounts between July 19, 2023, and November 22, 2024. For the following reasons, PayPal suspected that payments to the ███████ accounts from suspected buyer PayPal accounts represented the purchase of Child Pornography:

   a.  PayPal observed that user provided notes associated with some of the transactions to the ███████ accounts were indicative of the sale of child pornography on external file hosting services. Examples of the notes or payment requests provided in the CyberTip are:

      i.  ███████ I've got one more folder if ur interested It's all boys and dads but the 490 videos are all 2023 2024 lots of new and all contain penetration by

---

[1] Forty-two (42) of the ███████ accounts are held in ███████ name. An additional nine (9) accounts are held in the names of other individuals, but as discussed above, were linked to the ███████ account by various identifiers.

men It's to be the last one for a long time now it's too time consuming to keep hunting megas". Based on my training and communication with other law enforcement officers, I understand that "Megas" likely refers to an account on the Mega online file storage service, which can be used to share various types of files, including media files containing child pornography. Additional details regarding this payment note were contained in data subsequently provided by PayPal, Inc. This transaction note accompanied a June 23, 2024, payment of £20 to a ▓▓▓▓▓ account by a United States suspected buyer PayPal account with display name ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ sent funds on thirteen separate occasions[2] to seven different ▓▓▓▓▓ accounts between June 19, 2024, and November 3, 2024.

ii. ""One off special deal for. Tonight only The [£]20 is no more It goes bake to full [£]75 tomorrow Only because the owner saw in gave boys folder away cheap So I think tonight last time I have control of the keys." Based on my training and experience, I believe that the ▓▓▓▓▓ account is offering a limited time, reduced price (£20 instead of £75) for the sale of child pornography ("boys folder"). Additional details regarding this payment note were contained in data subsequently provided by PayPal, Inc. This transaction note accompanied a February 5, 2024, payment of £18 to a ▓▓▓▓▓ account by a France based suspected buyer PayPal account with

---

[2] The ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ attempted one additional transaction which was blocked by PayPal, Inc.

display name █████████████████████████████

███████████████████████ sent funds on four separate transactions to

a ████████ account on February 5, 2024.[3]

b. PayPal also observed messages[4] exchanged with the ███████ accounts using PayPal's chat functionality which PayPal identified as indicative of child pornography sale. Messages that were provided in the CyberTip are:

　i. "hey havnt seen U online Just so you know I have brand new 2023 2024 folder with 3 unseen Matt Estes and 198 new videos hd quality and very hard Matt Estes style and 3 double [special character] 20 normally easily. sell for 50 [special character] for U as I know U serious now hehe x[special character]." Based on information provided with the CyberTip and a review of open-source media[5], I am aware that Matthew Estes was convicted of production of child pornography and sentenced to 720 months confinement in an Eastern District of Tennessee case. Estes was found to have produced and distributed a video of Estes raping a 16-month-old victim. It was alleged that the video was located on the discussion board titled, "Toddler being pummeled without any regard to his well-being." Accordingly, I believe "198 new videos…Matt Estes style" refers to child pornography involving the abuse of young victims.

---

[3] ████████████████████████ attempted one additional transaction which was unsuccessful.
[4] The NCMEC CyberTip did not provide the date of these messages.
[5] *See* https://www.justice.gov/usao-edtn/pr/knox-county-man-sentenced-60-years-imprisonment-two-counts-production-child.

9

    ii. "Got one more folder if you want these its dads boys and all 2024 hd videos 19. 9gb fkive seen it i love it but this is the last folder I will look for for a while as it's taken too much of my time I need to break[emojis] and [emojis]One more for u then im taking a break from collecting this is double the vids doubke the hardcore dads[emojis]." Based on my training and experience, I believe this message refers to an offer to sell an additional quantity of child pornography videos.

c. PayPal identified three instances where suspected buyer PayPal accounts appeared to be held by individuals with prior arrests or conviction for child sexual abuse or child pornography offenses. Through a review of data subsequently obtained from PayPal, Inc., and a review of law enforcement records relating to criminal history, the following was identified:

    i.



    ii.



iii

d. PayPal identified an additional message associated with a request for payment which was believed to be an extortion attempt with text "I have a seargent atkinson he busts p3d0s but nkt in thr traditional sense you eill meet him in the morning…"

8. I subsequently reviewed the NCMEC CyberTip during the proactive review of investigative leads for subjects residing in HSI Charleston's area of responsibility.

9. PayPal provided law enforcement with account subscriber information and transactional data for both the ▮▮▮▮ accounts and the suspected buyer PayPal accounts pursuant to a Customs Summons. Law enforcement conducted a review of the suspected buyer PayPal accounts, which identified that seventy-nine (79) accounts listed addresses in the United States. Law enforcement queried law enforcement databases in an attempt to identify criminal history records or other relevant information. The following relevant criminal histories[6] appear to relate to the suspected buyer PayPal accounts:

---

[6] Subjects were found to be name/date of birth matches to criminal history records. Criminal histories are within the United States unless otherwise noted.

11

a.
b.
c.
d.
e.
f.
g.





h.

i.

j.

k.

l.

10. Law enforcement made contact with authorities in the [redacted] who advised that

11. Law enforcement made contact with investigators who participated in

12. Based on my training and experience, in conjunction with my review of

search warrant return from PayPal, I believe it is likely transactions to the PayPal

accounts are based on conversations which occur on encrypted messaging applications, such as

Telegram.

### *The James GOSNELL Accounts*

13. Law enforcement conducted a review of a PayPal account held in the name "James GOSNELL" with account number ("the GOSNELL account ending in 9731"), which was identified as a suspected buyer PayPal account in the NCMEC CyberTip.

---

[7]

[8] The results of this search warrant return are discussed further in paragraph 21.

14. The GOSNELL PayPal account ending in 9731 was created on November 4, 2024, and lists a primary street address of ████████████████ (i.e., the PREMISES), the email address ████████████ and the phone number ████████████ The GOSNELL account was created from IP address ████████ on November 4, 2024.

15. The resident of the PREMISES, James Gosnell, is a Charleston County Magistrate Judge.

16. The GOSNELL PayPal account ending in 9731 was the payer on two November 4, 2024, transactions to a single ████████ account for approximately $100 to a single ████████ account with PayPal account number ████████████████████████ ████████ The transactions occurred on November 4, 2024, between 4:38pm EST and 4:44pm EST. Both transactions had a transaction note "vids". There were no additional transactions conducted by the GOSNELL PayPal Account ending in 9731 (including to other accounts). On December 20, 2024, the GOSNELL PayPal account ending in 9731 placed a hold on both transactions,[9] reporting that it was unauthorized. Based on this Agent's training, experience, and conversation with other law enforcement officers, it is understood that individuals who purchase CSAM online often are purchasing login credentials to a file sharing site. As a result, CSAM vendors have little recourse in instances where the CSAM buyer reports the transaction as fraudulent, even if the exchange of the login information actually occurred. I am also aware of a report that collectors of child pornography sometimes reverse payments made to child pornography vendors if the product the collector receives is unsatisfactory.

---

[9] As discussed below in paragraph 22(a)(i), there was also correspondence from the ████████ account ending in ████ to the GOSNELL account ending in 9731 on November 5, 2025 regarding the processing of refunds.

17. November 4, 2024 falls within the timeframe that the  accounts were accepting payments linked to the suspected sale and distribution of child pornography.

18. Law enforcement databases identified IP address ▇▇▇▇ as resolving back to the net range of AT&T. A Customs Summons was served on AT&T. AT&T provided subscriber information indicating IP address ▇▇▇▇ was associated with "JAMES Gosnell" with service and billing addresses of ▇▇▇▇ (i.e., the PREMISES), the email address ▇▇▇▇ and the phone number ▇▇▇▇

19. James Gosnell has no other known connection to ▇▇▇▇

### *Investigative Steps regarding other suspected buyer PayPal accounts*

20. Following the receipt of the NCMEC CyberTip, law enforcement identified international travel by individuals associated with suspected buyer PayPal accounts named in the NCMEC CyberTip. Law enforcement requested that Customs and Border Protection Officers ("CBPOs") and/or Homeland Security Investigations Special Agents ("HSI Special Agents") make contact with international travelers and determine whether the traveler was associated with the suspected buyer PayPal accounts. CBPOs and HSI Special Agents were advised of suspicions that the suspected buyer PayPal accounts may have purchased child pornography. Four international travelers were contacted at international airports by CBPOs and/or HSI Special Agents with the following results:

a. 

16

b.

c.



17



d.

21. The ▮▮▮ PayPal account ending in ▮▮▮ (with which GOSNELL conducted transactions) had transactions with five additional accounts which were the subject of the PayPal NCMEC CyberTip between October 23, 2024, and November 4, 2024.



a.

b.

### *Investigative Steps regarding the* ███ *PayPal accounts*

22. On September 8, 2025, in District of South Carolina case number ███ a search warrant was obtained for information, including but not limited to, the content of messages and/or transaction comments of the ███ PayPal accounts. The following relevant details were observed in the search warrant return:

    a. The following messages or transaction comments[10] were relevant to the scheme, including but not limited to, GOSNELL:

        i. On November 5, 2024 (the day following the aforementioned GOSNELL to ███ transactions), the ███ PayPal account ending in ███ sent a message to the GOSNELL PayPal Account ending in 9731 with text "Hi i have finally sorted refunds but because you sent 2 identical payments PayPal have delayed it by 72hrs so will just havr to wait.  least they are on the way back now :)". As was previously discussed, the GOSNELL account later identified these transactions as unauthorized.

        ii. On May 19, 2024, a ███ PayPal account exchanged a message with a suspected buyer account ███ with the following messages:



---

[10] Through a reading of the messages in the of PayPal data, it is unclear who sent the messages in some instances. I have contacted PayPal requesting additional clarification.

iii. 

b. The following transaction notes were relevant to the scheme:

i. 

c. The following dispute/chargeback was identified as relevant to the scheme:

i.

20

d. The following additional transactions were identified as relevant to the scheme
including GOSNELL:

   i. On November 4, 2024, a second PayPal account in the name "james
Gosnell" with account number             ("the GOSNELL
PayPal account ending in 4954") was identified as having attempted three
transactions with a        PayPal account with account number

The transactions occurred on November 4, 2024, between 5:32 pm EST and
5:34 pm EST (shortly after the transactions with the GOSNELL PayPal
Account ending in 9731, which were previously discussed in paragraph 15).
The transactions were for $50, $80, and $103.45. All three transactions
listed the subject "Games". All three attempted transactions had the status
"Denied_Cancelled".[11]. The GOSNELL PayPal account ending in 4954 was
not previously identified as a suspect account in the NCMEC CyberTip. The
       PayPal account ending in    was previously identified as a
suspect account in the NCMEC CyberTip.

23. A review was conducted of the GOSNELL PayPal account ending in 4954, which indicated
the account was created on October 11, 2021, and lists a primary street address of

---

[11] Based on my review of PayPal's Help Center, I understand that transactions can be denied for a variety of reasons,
including but not limited to, because the source financial institution declines a transaction, an account is limited while
under a review by PayPal, or because details have not been confirmed.

█████████████████████████ (i.e., the PREMISES), a secondary email address of ███████████████████ and no phone number. The GOSNELL PayPal account ending in 4954 does not list a login IP address. The account is sourced from the same credit/debit card number as the GOSNELL PayPal account ending in 9731.

24. For the reasons articulated above, I submit there is probable cause to believe that GOSNELL, the SUBJECT identified above, is the individual who conducted transactions with a child pornography vendor.

## Identification of the SUBJECT PREMISES

25. A search of a commercial database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, and other information was conducted for GOSNELL. These public records indicated that GOSNELL's current address is █████████████████ █████████████████

26. A check with the South Carolina Department of Motor Vehicles on or about July 31, 2025, revealed that an individual named James Benjamin GOSNELL Jr with a date of birth of ███████ ███ resides at the PREMISES.

27. On or about March 10, 2016, GOSNELL applied for a United States passport, where he listed a home address of ███████████████████████ "PREMISES"), and listed a phone number of ██████████

28. On or about July 25, 2025, GOSNELL departed the United States on an American Airlines flight from Philadelphia, PA to Amsterdam, Netherlands. A review of records relating to GOSNELL's reservation indicates that email address ████████████████████ and phone number █████████████ are associated with the reservation.

22

29. On August 7, 2025, I conducted surveillance of the PREMISES. I observed a white Kia sports utility vehicle with South Carolina registration ▮▮▮▮ parked in the driveway. A review of South Carolina Department of Motor Vehicles records relating to South Carolina registration ▮▮▮▮ indicates the vehicle is registered to James Benjamin GOSNELL Jr at the PREMISES. I also saw a male walking a dog on the lawn of the PREMISES and then on the street in the vicinity of the PREMISES who appeared to be GOSNELL based on a review of photos of GOSNELL in law enforcement photos.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

30. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

    a. Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

    b. Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Once uploaded, they can easily be edited, manipulated, copied, and distributed. Paper photographs can be transferred to a computer-readable format and uploaded to a computer through the use of a scanner. Photos and videos taken on a digital camera or smartphone may be stored on a removable

23

memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.  A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections.  Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.  The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices.  Some media storage devices can easily be concealed and carried on an individual's person.  Smartphones and/or mobile phones are also often carried on an individual's person or inside their vehicle.

e.  The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion, including Internet Relay Chat, instant messaging programs, bulletin board services, e-mail,

and "peer-to-peer" (P2P) file sharing programs such as LimeWire and eMule, and networks such as eDonkey, Gnutella, ARES, Tumblr, and BitTorrent, among others.

f.  Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.  A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

h.  As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic

25

communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence that shows whether a computer contains P2P software, when the computer was sharing files, and some of the files that were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO PRODUCE, ADVERTISE, TRANSPORT, DISTRIBUTE, RECEIVE, POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

31. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who distribute, receive, possess, and/or access with intent to view child pornography:

   a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

   b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the

26

inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain their pictures, films, video tapes, photographs, magazines, negatives, correspondence, mailing lists, books, tape recordings and child erotica for many years.

d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the

27

individual "deleted" it..[12]

    f.   Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses (including email addresses), and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

    g.   Such individuals prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

32. There is probable cause to believe that James GOSNELL is in possession of child pornography on his electronic devices.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

33. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

---

[12] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, *e.g.*, *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

34. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users

29

typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

    d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

35.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic
storage media may provide crucial evidence of the "who, what, why, when, where,
and how" of the criminal conduct under investigation, thus enabling the United
States to establish and prove each element or alternatively, to exclude the innocent
from further suspicion.  In my training and experience, information stored within a
computer or storage media (e.g., registry information, communications, images and
movies, transactional information, records of session times and durations, internet
history, and anti-virus, spyware, and malware detection programs) can indicate who
has used or controlled the computer or storage media.  This "user attribution"
evidence is analogous to the search for "indicia of occupancy" while executing a
search warrant at a residence.  The existence or absence of anti-virus, spyware, and
malware detection programs may indicate whether the computer was remotely
accessed, thus inculpating or exculpating the computer owner.  Further, computer
and storage media activity can indicate how and when the computer or storage
media was accessed or used.  For example, as described herein, computers typically
contain information that log: computer user account session times and durations,
computer activity associated with user accounts, electronic storage media that
connected with the computer, and the IP addresses through which the computer
accessed networks and the internet.  Such information allows investigators to
understand the chronological context of computer or electronic storage media
access, use, and events relating to the crime under investigation.  Additionally,
some information stored within a computer or electronic storage media may provide
crucial evidence relating to the physical location of other evidence and the suspect.

31

For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer

32

and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

36. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic

33

evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

37.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted

34

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

38. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the location and on the electronic devices belonging to GOSNELL and described in Attachment A. I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

39. I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

40. This affidavit has been reviewed by AUSAs Katherine Orville and Emily Limehouse.

[SIGNATURE PAGE TO FOLLOW]

35

Respectfully submitted,

_K TL_

Kyle Tallio
Special Agent
Homeland Security Investigations

SWORN TO ME VIA TELEPHONE OR
OTHER RELIABLE ELECTRONIC MEANS
AND SIGNED BY ME PURSUANT TO
FED. R. CRIM. P. 4.1 AND 4(d) OR 41(d)(3),
AS APPLICABLE

Subscribed and sworn before me on
September 15, 2025

The Honorable H. Molly Cherry
United States Magistrate Judge

36